UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
BERNARDO ARCHER,

                          Plaintiff,                              **AMENDED MEMORANDUM**
                                                                  **AND ORDER**
       -against-                                            CV 21-5648 (ARL)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
------------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

        The plaintiff, Bernardo Archer ("Archer"), brought this appeal pursuant to the Social Security Act, 42 U.S.C. § 405 et seq. (the "Act"), challenging a final determination by the Commissioner of the Social Security Administration that he was ineligible to receive Social Security disability insurance benefits. Before the Court are the parties' cross motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, the plaintiff's motion is granted, the defendant's motion is denied, and the matter is remanded for further administrative proceedings, including a de novo hearing and new decision.

BACKGROUND

The following facts are drawn from the parties' Joint Stipulation of Facts.

**1.     Factual Background**

Archer is currently 50 years old, has a high school education and previously worked for a sanitation company as a garbage collector. Tr. 48-9, 5-2.[1] He has not engaged in substantial gainful activity since July 8, 2018. Tr. 23, 49. Archer injured his back in a work-related accident in early 2017, which resulted in radiating pain into his left leg. Tr. 279. A CT scan revealed degenerative changes and a nonspecific sclerotic focus in the right lilac bone possibly

---

[1] Tr. are citations to the Administration Transcript found at ECF No. 14.

representing an incidental bone island. Tr. 283. But the films showed no acute fracture or subluxation and no high-grade spinal canal or foraminal stenosis. Tr. 283. During the examination following the accident, Archer exhibited no tenderness to palpation of the cervical, thoracic, or lumbar spine. Tr. 281. He did have decreased range of motion of the lumbar spine secondary to pain in the lower back and his straight leg raising test was positive. Tr. 281. He also walked with a "mild" limp secondary to pain in the back. Tr. 281. He was able to move all extremities and had normal strength. Tr. 281. Archer was not hospitalized and was advised to take Tylenol and Motrin. Tr. 281. Following his February 2017 injury, and prior to the date he claims to have become disabled,[2] Archer went to physical therapy, saw a chiropractor and received injections for pain relief. Tr. 305, 308, 317, 322, 326, 334.

Archer claims that he has been disabled since July 8, 2018. At an examination on September 25, 2018, he presented with painful swallowing, dark urine and difficulty with walking. Tr. 502. Dr. Fanaee, his treating physician, noted that an MRI of his lumbar spine showed degenerative disc disease at L4-5 and L5-S1, facet arthropathy and lumbar spondylosis at L4-5 and L5-S1, in addition to disc bulge at L4-5 and L5-S1 moderately narrowing the neural foramina bilaterally. Tr. 503. During the examination, Archer exhibited normal range of motion over his major joints and full motor strength. Tr. 503. His straight leg raising test was negative, but he had a decreased area of sensation consistent with an L5 dermatome in the left leg. Tr. 503. Archer agreed to try epidural steroid injections to treat his back pain. Tr. 503.

Archer saw Dr. Fanaee again in January and February 2019, complaining of low back and right leg pain and numbness. Tr. 733-34. Dr. Fanaee noted in the chart that Archer had received medial branch blocks in October 2017 and January 2019 with 60 percent pain relief for two

---

[2] Archer does not claim to have become disabled as of the date of the accident.

2

weeks before returning to baseline.  Tr. 733.  Upon examination, Archer had normal strength.  Tr. 734.  His spine was not tender and a straight leg raising test was negative bilaterally.  Tr. 734.  Archer did have a decreased area of sensation along the L5 dermatome of the left leg.  Tr. 734.  Dr. Fanaee diagnosed him with lumbar herniated disc, lumbar spondylosis, lumbar degenerative disc disease and lumbosacral radiculitis, and recommended radiofrequency ablation of L3, L4 and L5.  Tr. 733-34.

Archer returned to Dr. Fanaee in March 2019, complaining of occasional severe back and leg pain despite recently undergoing radiofrequency ablation.  Tr. 722-23.  A physical examination revealed a decreased area of sensation consistent with an L5 dermatome in the left leg.  Tr. 723.  By that point, Archer had undergone physical therapy, epidural steroid injections, and medial branch blocks, with varying degrees of success.  Tr. 722.  His examination was unchanged.  Tr. 723.  According to Dr. Fanaee's records from March 26, 2019, Archer had "failed conservative therapy."  Tr. 723.  On April 2, 2019, Archer then had an MRI of his lumbar spine that revealed significant degenerative disc disease from L4 to S1, facet arthropathy and lumbar spondylosis L4-S5 and L5-S1, and a disc bulge at L4-L5 and L5-S1 moderately narrowing the neural foramina bilaterally.  Tr. 731, 734.

Archer returned to Dr. Fanaee's office on April 9, 2019, complaining of low back pain that radiated into both of his legs.  Tr. 718.  He reported that he had been undergoing chiropractic treatments, which he found "somewhat helpful."  Tr. 718.  Archer also reported 100% improvement of leg symptoms following an epidural steroid injection in October 2018, but only mild improvement in back pain.  Tr. 718.  He further stated that his left leg pain had subsequently returned.  Tr. 718.  Archer denied arm or leg weakness but reported difficulty with walking.  Tr. 718.  On examination, Archer appeared in "minimal distress," had normal joint

stability, normal range of motion over major joints, full motor strength, and a decreased area of sensation consistent with the L5 dermatome bilaterally. Tr. 719. However, his straight leg raising test was positive. Tr. 719. Dr. Fanaee recommended another injection, as well as a surgical consultation. Tr. 719.

Archer presented to Dr. Salvatore Palumbo in April 2019 with continued complaints of back pain. Tr. 692-93. A lumbar MRI demonstrated advancing significant degenerative disc disease at L4 – 5 and L5 – S1 and central disc herniation at L5 – S1 with some contact of the traversing nerve roots and non-significant compression. Tr. 693, 713. Archer indicated that he had pain across the lumbosacral junction as well as some intermittent pain in the anterior of his right thigh. Tr. 693. He also noted that he had received several injections that did provide some temporary relief but that the pain eventually returned. Tr. 693. During the examination, Archer had mild tenderness to palpation of the low back. Tr. 693. His motor examination was intact and reflexes were 2+ and symmetric. Tr. 693. Dr. Palumbo recommended continued conservative measures and Archer agreed not to pursue surgery. Tr. 693.

In June 2019, Archer returned to Dr. Fanaee complaining of low back pain radiating into his right leg. Tr. 659. At the time, Archer's chief complaint was "low back pain radiating into the right leg for several years." Tr. 659. Archer noted that he was recovering from epidural steroid injections in his lumbar spine with no apparent complications. Tr. 659. He further reported almost near improvement since the injection and stated that he had resumed chiropractic treatments and had no new issues to report. Tr. 659. After examining him, Dr. Fanaee noted that Archer had a positive straight leg raise test and decreased area of sensation consistent with L5 dermatome in both the right and left side. Tr. 660. He had normal joint stability with normal range of motion over his major joints. Tr. 660. Archer also displayed full strength in all of his

4

extremities. Tr. 660. Fanaee again diagnosed him with lumbar herniated disc, lumbosacral radiculitis, lumbar degenerative disc disease, and lumbar spondylosis. Tr. 660. He also noted that Archer had 90 percent reduction of pain going into the right leg with injections and suggested that Archer continue with physical therapy and chiropractic treatments. Tr. 660.

In December 2019, in connection with his disability application, Archer was seen by a consulting physician, Dr. Shtock. Tr. 749. Dr. Shtock is a pain management and rehabilitation specialist. *Id.* During the examination, Archer reported having fallen two weeks prior to the exam on his right knee due to weakness in the right lower extremity. *Id.* He also stated that he had pain in his lower back with episodic radiating pain and numbness to his right lower extremity. *Id.* Archer said that he had difficulty ambulating and his pain was aggravated with prolonged walking, standing, stair climbing, bending, and heavy lifting but was relieved by rest, refraining from aggravating activities and medication. *Id.* Archer advised Dr. Shtock that he was independent and cooked twice a week, he did laundry and shopped once a week, but his children assisted with the cleaning. Tr. 750.

Dr. Shtock's physical examination of Archer revealed that he was obese, had a slight limp, had difficulty walking on toes, was unable to walk on his heels or squat beyond 30%, had limited range of motion in the spine with tenderness, had right knee tenderness and swelling, and had decreased touch sensation on the right thigh and foot. Tr. 751-52. A spine X-ray taken at the time revealed moderate degenerative changes at the L4-S1 levels. Tr. 753. Dr. Shtock noted that Archer had a history of a work-related injury to the lumbar spine, reported a history of fall, reported a history of lower back pain, reported a history of knee pain, gait dysfunction, obesity and hypertension. Tr. 751-52. Based on the above, Dr. Shtock opined that Archer had mild limitation with heavy lifting, mild limitation with squatting, kneeling, and crouching, mild to

5

moderate limitation for frequent stair climbing, mild to moderate limitation walking long distances, and mild to moderate limitation standing and sitting long periods, and moderate limitation for frequent bending.  Tr. 752.

On February 18, 2020, Archer then sought treatment for his back pain at Northwell Health.  Tr. 804.  He saw Daniel Brandenstein, D.O. and asked for a second opinion on whether he should undergo low back surgery.  *Id.*  Archer noted that his prior chiropractic treatment, injections, and physical therapy did not result in "much improvement."  *Id.*  On examination, Archer was in no apparent distress and participated "well" with the orthopedic evaluation.  Tr. 805.  But radiculopathy at L5 was observed with a pinwheel/manual examination.  *Id.*  Dr. Brandenstein noted that Archer's lower extremity strength and his range of motion of the lumbar spine were "well maintained."  *Id.*  He further reported that Archer's deep tendon reflexes were also "well maintained" at 2+/4 and were symmetric.  *Id.*  Dr. Brandenstein remarked that Archer ambulated in a "non-myelopathic manner."  *Id.*  Finally, Dr. Brandenstein indicated he would determine further treatment after another lumbar MRI.  *Id.*

On February 27, 2020, C. Li, M.D., another State agency medical consultant at the initial level of administrative review, determined that Archer could perform a range of light exertional level work; but could stand or walk four hours a day and had additional postural limitations.  Tr. 80-1.

In March 2020, Dr. Hershey reported that Archer's May 2019 lumbar epidural injection provided a 90% improvement of pain symptoms following the injection.  Tr. 760.  Dr. Hershey prescribed Medrol Dosepak and advised Archer to discontinue Oxycodone.  *Id.*  Dr. Hershey also prescribed aquatic physical therapy, which Archer noted had "helped him tremendously in the

6

past." Tr. 760. Right side steroid injections were then administered on March 18, 2020. Tr. 760-61.

At a follow-up examination on April 9, 2020, Archer reported that his symptoms had returned to pre-injection baseline and he rated his pain as 8/10. Tr. 761. He stated that he had had "100% resolution" of the back pain following the March 18 injection but described recurrence of the pain. *Id.* Archer also reported working in a warehouse at that time and that prolonged standing aggravated his pain. *Id.* Archer noted he was not taking any medications for his symptoms because he "[did] not like to take pills." *Id.* He again stated he wanted to restart aquatic physical therapy because he found it "very helpful" in the past. *Id.* Dr. Hershey recommended a repeat epidural steroid injection at L4-5 and L5-S1 bilaterally. Tr. 762. At a further follow-up examination with Dr. Hershey on July 9, Archer described "excellent reduction of his overall pain level" and denied any adverse effects from the injections. Tr. 763.

On August 4, 2020, a State agency medical consultant at the reconsideration level of review, A. Periakaruppan, M.D., concluded Archer could perform light work subject to postural limitations. Tr. 90, 91. Unlike Dr. Li, Dr. Periakaruppan determined that Archer could stand or walk six hours out of an eight-hour day. Tr. 90.

Archer returned to Dr. Hershey in September 2020. Tr. 771. Dr. Hershey noted that Archer had undergone a third round of bilateral L4-5 and L5-S1 transforaminal epidural steroid injections for the year. Tr. 771. Archer reported relief following the injections but that it only lasted two to three weeks. *Id.* During the September 2020 examination, Archer reported left leg numbness when sitting for prolonged periods or driving in his car and difficulty walking more than three blocks. *Id.* It was noted Archer stopped working in August and was attempting to apply for disability. *Id.* He denied adverse effects from the injections. *Id.* Archer also indicated

7

that more recently, he had returned to pre-injection baseline and rated his pain a 7/10.  *Id.*  He further stated that his left leg went numb with prolonged sitting.  *Id.*  In addition, he noted difficulty walking more than 3 blocks without pain.  *Id.*  Dr. Hershey diagnosed him with lumbar herniated disc, lumbosacral radiculitis, lumbar degenerative disc disease, and lumbar spondylosis. Tr. 771-72.

A lumbar MRI was then performed in October 2020, which revealed desiccated central disc herniation at L5-S1 indenting the thecal sac, moderate compression of the thecal sac at L4-5 secondary to epidural lipomatosis and associated concentric bulging disc, ligamentous hypertrophy and facet arthropathy, grade 1 anterolisthesis of L4 and L5, and mild bilateral L4-5 and L5-S1 foraminal stenosis. Tr. 765-66.

In November 2020, Archer was ambulatory with a cane and reported having 8/10 pain. Tr. 800.  At the time, Archer advised that he "contemplating going on disability for his pain complaints." *Id.*  Dr. Hershey noted that a recent MRI revealed moderate compression of the thecal sac secondary to concentric bulging disc and mild progression since the prior examination. *Id.*  A physical examination revealed limited range of motion of the spine, antalgic gait, ambulation with cane, positive straight leg raising maneuver on the left and positive FABER on the left. Tr. 801.  During the examination, Archer did not have pain on palpation over the bony prominences of his spine.  *Id.*  He had full strength in the lower extremities and his sensation was intact to light touch.  *Id.*  Dr. Hershey again diagnosed him with lumbar herniated disc, chronic lumbar radicular pain and lumbar lipomatosis and discussed the risk and benefits of repeating right sided epidural injections.  *Id.*

On December 8, 2020, Archer saw Barry Balot, D.O., for an annual wellness visit.  Tr. 810.  During the review of systems, Archer reported back pain, but denied gait problems.  Tr.

8

812.  He displayed normal range of motion but exhibited lumbar spine tenderness.  Tr. 813.  He was advised to follow up with pain management for epidural injections.  Tr. 814**.**

        2.        **Procedural History and Relevant Non-medical Evidence**

On August 15, 2019, Archer filed a Title II application for disability insurance benefits due to a spinal cord injury and herniated disc with a disability onset date of July 8, 2018.  Tr. 15, 18, 208.  In the written function report submitted with the application, Archer reported that he lived in a house with his family.  Tr. 218.  He used a cane and brace, which were not prescribed by a doctor.  Tr. 219.  He stated that he could walk for approximately 30 minutes, stand for approximately one hour and sit for approximately 45 minutes.  Tr. 220.  He said he was unable to lift over 20 pounds and had difficulty climbing stairs, kneeling, and squatting.  Tr. 221.  Archer reported that his hobbies included attending school activities for his children and watching television, and his social activities involved spending time with others and going to church.  Tr. 221.  He indicated that he had no problems with personal care tasks, went outside every day, drove, prepared meals and went shopping occasionally.  Tr. 222-24.

His claim was denied on February 27, 2020.  Tr. 15.  He sought reconsideration and that request was also denied on August 5, 2020.  *Id.*  Thereafter, Archer filed a written request for a hearing.  *Id.*  On January 25, 2021, a telephone hearing was held before Administrative Law Judge David Tobias due to the extraordinary circumstances presented by the COVID-19 Pandemic.  Archer testified at that hearing that he had difficulty sitting and standing.  Tr. 55.  Specifically, he indicated that sitting caused his right leg to become numb.  Tr. 55.  He attested that he could sit for approximately 45 minutes to an hour, could stand for approximately 45 minutes, and could walk for approximately 40 minutes.  Tr. 56.  He further indicated that he could lift up to 15 pounds.  Tr. 56.  He noted, however, that he had trouble bending at the waist

and with his balance. *Id.* He stated that his ability to bend at the knees, kneel and crouch down was "not good" and he could "turn over easily." Tr. 57. He also noted that he had trouble using his right hand due to arthritis. *Id.* Archer stated that he did not believe he would be able to maintain a job that required sitting or standing most of the day. Tr. 58.

Archer further testified that he takes Ibuprofen but continues to have chronic pain. Tr. 61. He testified that he has fallen several times due to leg numbness. *Id.* He also testified that he uses a walking stick and a back brace. Tr. 62. Archer noted that he has difficulty sleeping at night due to pain and takes daily naps for two to three hours. Tr. 63-4. He also noted that he relies on his stepfather, wife and children for laundry, household chores and shopping. Tr. 64-5. He stated that he thought he could stand for two hours total in an eight-hour day. Tr. 64.

The ALJ asked Archer to explain why he felt he was disabled. Tr. 54. Archer responded that "number one, [he could not] do what [he] love[s] to do," which was heavy work. *Id.* When asked if he could do a job that did not involve heavy work, Archer responded that he "tried already" but that he still had "all the same problems." Tr. 55. He further stated that the jobs he tried to perform were part-time. Tr. 49-53, 66-67. An impartial vocational expert from Vocational Experts Inc., Ellen Levine ("Levine"), also appeared at the hearing. Tr. 51. She first testified about Archer's past employment as a trash collector, industrial truck operator and warehouse worker, all of which required medium to very heavy exertion. Tr. 66-67. The ALJ then asked Levine to consider a hypothetical individual who has the residual functional capacity to perform work at the light exertional level with the following limitations: occasional climbing of stairs, ramps, ladders, scaffolds; and occasional balancing, stooping, crouching, kneeling, or crawling. Tr. 67. Levine testified that such an individual could not perform Archer's past work. Tr. 67. However, she noted that the hypothetical individual would be able to perform other

10

positions in the national economy, such as small parts assembler, laundry folder and inspector/hand packager. Tr. 67.[3]

The ALJ then asked the VE to consider a hypothetical individual limited to work at the sedentary exertional level. Tr. 68. Levine testified that such an individual could not perform Archer's past work. Tr. 68. Nonetheless, the ALJ asked Levine to consider the same individual with the additional limitation of requiring a sit/stand option with periods of sitting limited to no more than 45 minutes at a time for a total of at least six hours and periods of standing limited to no more than 45 minutes at a time for a total of two hours and who would be off task momentarily. Levine testified that there would be no position available for such an individual. Tr. 68.

Finally, the ALJ then asked Levine to consider the individual in the first hypothetical with the additional limitation of a sit/stand option at 45-mimute intervals but who could sit and stand for a total of 6 hours. Tr. 69. Levine testified that this individual would be able to perform the jobs of small parts assembler, laundry folder and inspector/ hand packager. Tr. 69. However, if the individual could only stand for a total of three hours, then there would be no positions available. Tr. 69. The light positions would still be available if the individual could stand for a total of only four hours. Tr. 69.

In a decision dated February 9, 2021, the ALJ found that Archer was not disabled. Tr. 24. Archer filed a request for review with the Appeals Council. In connection with his appeal, Archer submitted additional notes indicating that on January 27, 2021, he had gone to the hospital emergency department. Tr. 31. According to the operative note, Archer presented with intractable lower extremity pain and weakness, including significant weakness in his distal right

---

[3] Levine indicated that there are 176,000 small parts assembler jobs nationally; 398,000 laundry folder jobs nationally and 280,000 inspector/hand packager jobs nationally. Tr. 24.

11

lower extremity.  *Id.*  Imaging demonstrated severe spinal stenosis with spondylolisthesis at L4-5 due to severely degenerated disc and advanced degenerative disc disease with collapse at L5-S1. *Id.*  Shortly thereafter, on January 28, he had a L4 and L5 decompressive laminectomy, L5-S1 posterior lumbar interbody fusion using biomechanical cage, L4-S1 segmental posterolateral/intertransverse fusion, L4-S1 bilateral pedicle screw instrumentation, and harvest of laminar autograft bone with Dr. Palumbo.  Tr. 30-31.

Archer's request for review with the Appeals Council was denied on August 12, 2021. As such, the decision of the ALJ became the final decision of the Commissioner from which Archer filed his appeal.  Tr. 1.

## DISCUSSION

### 1. Standards

#### A. Motion for Judgment on the Pleadings

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12 (c) should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Rojas v. Berryhill,* 368 F. Supp. 3d 668, 669 (S.D.N.Y. 2019*)* (citing *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995)).  "The standard for addressing a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as the standard used in evaluating a motion to dismiss under Rule 12(b)(6)." *Id.*  The Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing a decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g)**.**

B.  **Review of ALJ's Decision**

In reviewing a decision of the Commissioner of Social Security, a district court may set aside a determination "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin,* 802 F.3d 370, 374-75 (2d Cir. 2015) (citations omitted); *see* 42 U.S.C. § 405(g).  In other words, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record"); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a de novo review").  However, "[s]ubstantial evidence [means] more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401) (internal quotation marks omitted)).

C.  **The Disability Determination**

To be eligible for disability benefits under the Act, a claimant must establish that he, she or they is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see Burgess v. Astrue*, 537 F.3d 117, 119 (2d Cir. 2008).  The Act further states that this impairment must be "of such severity that [the claimant] is not only unable to do

13

[his, her, their] previous work but cannot, considering [his, her, their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000); *Nascimento v. Colvin*, 90 F. Supp. 3d 47, 51 (E.D.N.Y. 2015); *Marinello v. Comm'r of Soc. Sec.*, 98 F. Supp. 3d 588, 592-93 (E.D.N.Y. 2015).

In order to determine whether a claimant is disabled within the meaning of the Act, the Social Security Administration has promulgated regulations prescribing a five-step sequential analysis for evaluating disability claims. See 20 C.F.R. §§ 404.1520; 416.920. The Second Circuit has summarized this procedure as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant can perform.

*Telavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012). The claimant bears the burden of proof at steps one through four of the sequential inquiry, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Id.; Nascimento*, 90 F. Supp. 3d at 51. In making these determinations, the Commissioner "must consider four factors '(1) the objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational

background, age, and work experience.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)(per curiam)).

    **2.    Analysis**

In this case, the ALJ found that Archer met the insured status requirements of the Social Security Act through December 31, 2023; had not engaged in substantial gainful activity since July 8, 2018; suffered from severe lumbar degenerative disc disease and lumbar spondylosis; and that his impairments significantly limited his ability to perform basic work activities. Tr. 18. Yet, he concluded that Archer was not disabled because there was no evidence that the combined clinical findings from such impairments reach the level of severity contemplated in the listings. *Id.* The ALJ, therefore, held that Archer had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) except he was limited to occasional climbing of stairs and ramps, occasional climbing of ladders and scaffolds, and occasional balancing, stooping, crouching, kneeling and crawling. Tr. 19.

Based on its review of the record, the Court finds a lack of substantial evidence to support the ALJ's determination. To begin with, in reaching his conclusion, the ALJ utterly rejected Archer's statements concerning the intensity, persistence and limiting effects of his symptoms, stating that his description was "not entirely consistent with the medical evidence." The ALJ also gave no "specific evidentiary weight" to the medical opinions of Archer's treating physicians or to prior administrative medical findings. Instead, the ALJ chose to rely entirely on the opinions of the third consultative physician that Archer could stand at work for four hours and the vocational expert that there existed jobs in significant numbers in the national economy that Archer could nonetheless perform – namely, small parts assembler, laundry folder and inspector/hand packager. "In deciding a disability claim, an ALJ is tasked with 'weigh[ing] all

15

of the evidence available to make an RFC finding that [is] consistent with the record as a whole.'" *See Zacharopoulos v. Saul*, No. 19-5075 (GRB), 2021 WL 235630 (E.D.N.Y. Jan. 25, 2021) (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). He did not do so in this case.

Specifically, although the ALJ recited the objective medical evidence offered by Archer, he outright rejected any of Archer's subjective evidence – never adequately explaining why he found Archer's descriptions of his symptoms to be inconsistent with that evidence. Indeed, the ALJ appears to have given no weight to numerous test reports and test results submitted by Archer's treating physicians all of who found that Archer had, among other things, severe lumbar herniated discs, chronic lumbar radicular pain and lumbar lipomatosis, facet arthropathy and lumbar spondylosis and moderate narrowing of the neural foramina bilaterally. He did so despite the fact that the findings of Archer's treating physicians were supported by objective medical evidence and were consistent with other medical or non-medical sources. *See Balotti v. Comm'r of Soc. Sec.*, 605 F. Supp. 3d 610, 616 (S.D.N.Y. 2022); *see also Rushford v. Kijakazi*, No. 23-317, 2023 WL 8946622, at *1 (2d Cir. Dec. 28, 2023) (ALJ was obliged to consider the submitted medical opinions based on several factors set forth in the regulations and to explain how the two "most important" factors – supportability and consistency – applied to each opinion).

Notably, the ALJ also appears to have rejected the finding of two of the defendant's own consultants, the first who assessed Archer as having mild to moderate limitations in walking long distances and sitting and standing for long periods and moderate limitation for frequent bending. To this end, the ALJ stated that he found the first consultative physician's conclusion to be unpersuasive because it was "vague with regard to exertional and postural limitations." Tr. 20. He similarly discounted the findings of the State's second medical consultant regarding Archer's

16

limitation of standing and walking for only 4 hours because he felt the examination of Archer's lower extremities showed full motor strength.  Indeed, he simply opted to accept the findings of the third medical consultant that in an eight hour workday, Archer could sit for 6 hours, stand/walk for 6 hours, and lift and carry up to 20 pounds – a finding which allowed him to justify his conclusory determination that Archer could perform light work.[4]

Finally, it warrants mention that the courts in this and other Circuits have repeatedly express dissatisfaction about the Commissioner's reliance on vocational expert testimony predicated on plainly obsolete positions. *See Zacharopoulos v. Saul*, No. 19-5075 (GRB), 2021 WL 235630 (E.D.N.Y. Jan. 25, 2021); *Cunningham v. Astrue*, 360 F. App'x 606, 615 (6th Cir. 2010); *Skinner v. Berryhill*, No. CV 17-3795-PLA, 2018 WL 1631275, at *6 (C.D. Cal. Apr. 2, 2018).  For example, a Western District of Kentucky court noted in *Sorrell v. Berryhill*, No. 4:18-CV-00029-HBB, 2019 WL 360523 (W.D. Ky. Jan. 29, 2019) that the laundry folder position (DOT 369.687-018) has not been updated since 1978.

For all these reasons, the Court remands this matter to the Commissioner for further proceedings.  The Clerk of Court is directed to close the case.

Dated: Central Islip, New York         **SO ORDERED:**
       March 19, 2024

                                        _____/s/_____
                                        ARLENE R. LINDSAY
                                        United States Magistrate Judge

---

[4] At the January 25, 2021 hearing, Archer testified that he could stand for approximately 42-5 minutes, walk for approximately 40 minutes, sit for approximately 15 minutes, and lift up to 15 pounds. Tr. 55-9.  Although the ALJ questioned the veracity of his testimony, two days after the hearing, Archer presented to the emergency room with intractable lower extremity pain and "significant weakness in his distal right lower extremity." Tr. 31.  His imaging confirmed that he had severe spinal stenosis with spondylolisthesis at L4-5 due to severely degenerated disc and advanced degenerative disc disease with collapse at L5-S1. Tr. 31.  In fact, Archer was admitted to the hospital and required surgery.  *Id.*